**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARTIN JAMES KIPP, *Petitioner-Appellant*, <br><br> v. <br><br> RON DAVIS, Warden, California State Prison at San Quentin, *Respondent-Appellee*. | No. 15-99020 <br><br> D.C. No. 2:03-cv-08571-PSG <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted March 28, 2019
San Francisco, California

Filed August 19, 2020

Before:  Richard A. Paez, Mary H. Murguia, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Martin James Kipp's habeas corpus petition challenging his conviction and death sentence for first-degree murder, forcible rape, and robbery.

The district court granted a certificate of appealability for two of Kipp's claims: (1) that the admission of his references to Satan in two letters violated his First Amendment rights; and (2) that his counsel was ineffective for failing to adequately litigate the admissibility of those references. The panel expanded the COA as to two additional claims: (1) that the jury's use of the Bible during deliberations violated Kipp's right to a fair trial; and (2) that Kipp's counsel was ineffective by failing to adequately investigate and present mitigating evidence during the penalty phase.

Kipp contended that as in *Dawson v. Delaware*, 503 U.S 159 (1992), the evidence of his references to Satan was not connected in any way to his crime, and thus its sole relevance was to show that his beliefs were morally reprehensible, thereby violating his First Amendment rights. The panel affirmed the denial of relief on this claim because any constitutional error was harmless at both the guilt and penalty phases.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reviewed Kipp's ineffective-assistance-of-counsel claims under AEDPA deference. The panel wrote that because the admission of the Satan references could not have had substantial and injurious effect or influence in determining the jury's verdict, Kipp cannot meet the higher *Strickland* standard of prejudice. The panel therefore affirmed the denial of habeas relief on Kipp's claim that counsel was ineffective by failing to competently litigate the admissibility of the references to Satan. As to Kipp's claim that his trial counsel was ineffective during the penalty phase by failing to adequately investigate and present mitigating evidence regarding his life, the panel held that the state court could have reasonably rejected the claim for failing to adequately establish deficient performance, and could reasonably have concluded that any deficiency in counsel's performance did not prejudice the result.

Applying AEDPA deference, the panel found it unnecessary to decide whether the use of Bible verses during jury deliberation constitutes misconduct because the state court could have reasonably concluded that any error did not prejudice the jury's verdict.

## COUNSEL

Celeste Bacchi (argued), Mark R. Drozdowski, and Jennifer Hope Turner, Deputy Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Randall D. Einhorn (argued) and Ronald A. Jakob, Deputy Attorneys General; Holly D. Wilkens, Supervising Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office

of the Attorney General, San Diego, California; Respondent-Appellee.

## OPINION

NGUYEN, Circuit Judge:

Martin James Kipp was sentenced to death following his conviction for the first-degree murder, forcible rape, and robbery of 18-year-old Tiffany Frizzell in Long Beach, California, in September 1983.[1]  Kipp appeals the district court's denial of his petition for writ of habeas corpus.  We affirm.

## I.  BACKGROUND[2]

### A.  The Guilt Phase

Tiffany Frizzell was an 18-year-old who had recently left her home in Indianola, Washington to begin her college studies at Brooks College.  Because her dormitory had not yet opened to students, she stayed nearby at a Ramada Inn along the Pacific Coast Highway in Long Beach, California.

Frizzell's body was discovered on the morning of Saturday, September 17, 1983, by the housekeeping staff at

---

[1] Kipp was also separately sentenced to death for the murder of Antaya Yvette Howard in Orange County in December 1983.  Kipp's federal habeas petition for that conviction and sentence is addressed in a separate opinion (No. 16-99004).

[2] These facts are taken largely from the California Supreme Court's opinion in Kipp's direct appeal, *People v. Kipp*, 26 Cal. 4th 1100, 33 P.3d 450 (2001).

the Ramada. Her body was on the neatly made bed, on top of the sheets and blanket but under the bedspread. She was naked from the waist down, and a cloth belt had been pulled tight around her neck. She was also wearing a blouse but no bra, although a small hook (likely from her missing bra) was found embedded in the skin of her back. There were no signs of forced entry into the hotel room and no signs that a struggle had occurred, but one of her fingernails was broken. Frizzell's purse, driver's license, and around $130 in cash were found in a dresser in the room. Kipp's fingerprint was found on the telephone in the room.

A criminalist found semen and sperm in Frizzell's vagina and on her external genital area, but not in her mouth or rectal area. During her autopsy, the medical examiner removed the belt from her neck and revealed a deep ligature mark and scratches consistent with fingernails. There was also bruising on her abdomen, thigh, and shoulder, as well as a small abrasion on the back of her left hand, all of which appeared to have occurred in the 48 hours before her death. While there was no trauma to the external vaginal or anal areas, there were indications of sexual intercourse. The medical examiner found the cause of death to be asphyxiation due to ligature strangulation.

Two days after her body was found, a gardener in Long Beach found a bag in some bushes next to an alley, about a half-mile from the Ramada Inn. The bag contained Frizzell's personal items, including a torn bra with a missing fastener, and a book with Frizzell's name inside the cover. Frizzell's mother identified the items as Frizzell's, and both Frizzell's and Kipp's fingerprints were found on the book. About a month after her death, Kipp sold to a pawn shop in Westminster a stereo and cassette player that Frizzell's mother identified at trial as belonging to Frizzell.

In addition to the above evidence, the prosecution also introduced evidence to show consciousness of guilt. Specifically, the jury heard that, after his arrest, Kipp twice attempted to escape, once from an Orange County jail and then from a Los Angeles County jail. The first attempt was planned by Kipp's then-wife, Linda Anne Kipp, with an undercover investigator. Linda intended to have her son climb into the air conditioning ducts and guide Kipp out through a public restroom. Linda was arrested on April 18, 1987, after she paid $500 to the investigator to assist in the planned escape. During the second attempt, Kipp was found in the ceiling of his cell, where he had begun to escape through a hole. Guards had to pull Kipp out by his legs and subdue him.

The prosecution also introduced a handwritten letter postmarked on September 15, 1987 (the "September 15 letter") that Kipp wrote to his wife Linda, after she was arrested and jailed for attempting to help him escape. In the letter, Kipp mostly adulates Linda and their relationship, but he also referred to the crimes for which he was being tried: "I killed, raped, sodomized, beat, swore and laughed at those fucking no good bitches! Yeah! It felt great, because neither deserved to live anymore." Kipp also twice referred to Satan: "Well, 'Satan's' licking both those bitch's [sic] up now and laughing. Just like I laughed at my trial the whole time. . . . We are coming Home Satan!" During closing argument, the prosecution successfully admitted the letter into evidence and read aloud a portion of the letter.

The defense called no witnesses and presented no exhibits at the guilt phase.

The jury found Kipp guilty of robbery, rape, and first-degree murder. The jury also found true the special circumstance allegation that the murder occurred in the

course of a rape. The jury was unable to reach a verdict on a second special circumstance allegation that the murder occurred during a robbery.

## B. The Penalty Phase

### 1. Prosecution's Case in Aggravation

The prosecution's aggravation case included evidence of Kipp's extensive history of violence against women, including the murder of another young woman, Antaya Yvette Howard.

The jury first learned that three years before Frizzell's murder, Kipp had choked and raped June Martinez, whom he had met at a bar in Long Beach. Kipp lured her to his truck, turned on the stereo, and had her shut the door. As she did so, Kipp drove off, hitting a car on his way out, and stopped in a residential area. Martinez asked to be taken back, but he refused, at which point she noticed that there was no inside door handle on the passenger side. Kipp pushed her into the back of the truck, which had been covered with a windowless shell, and started to remove her clothes. After she began to scream, he put his hand in her mouth. Kipp began to strangle her when she bit him. He finished removing her clothes and raped her. Her body had gone limp and she was unable to breathe. Kipp demanded that she orally copulate him, and she said she would if he gave her some fresh air. As soon as he opened the door, she ran out, flagged down a motorist, and reported the incident to the police. Martinez had severe bruises on her neck and wore a neck brace for two weeks after the attack. Kipp was convicted of felony rape.

In November 1983, shortly after Frizzell's murder, Kipp had violently assaulted and threatened to kill his then-

girlfriend Loveda Newman. During an argument one morning in the motel room where they had been staying, Newman had refused to have sex with Kipp; he responded by punching her in the head and choking her. She told him she needed to go to the bathroom because she was going to vomit. When she got to the bathroom, she locked the door and climbed through the window, although Kipp kicked down the door as she was escaping. Kipp was later arrested, but Newman did not press charges because Kipp threatened to kill her and her son if she did.

Finally, in December 1983, just three months after he raped and murdered Frizzell, Kipp sexually assaulted and murdered Antaya Yvette Howard. Howard, who was 19 years old, was seen drinking champagne with Kipp at a restaurant in Newport Beach, California. A few days later, a woman called the police because a foul odor was emitting from a car that had been parked in an alleyway for several days. The police arrived and found Howard's badly decomposed body covered by a blanket in the back of the car. Her blouse was open and missing two buttons, and her bra had been rolled up, exposing her breasts. Kipp's fingerprints were found on the window of the car's front doors, and on a beer can in the front passenger floorboard. Howard died of asphyxiation due to strangulation, with trauma to the head contributing to her death. Kipp denied having known Howard but could not explain the presence of his fingerprints.

In addition to evidence of Kipp's violence, the jury heard that he tried to escape through a hole in the ceiling of the Los Angeles County jail in January 1988. Upon being detained, he threatened to kill a sheriff's sergeant. An officer testified that Kipp "swore to me and his savior, Satan, [the sergeant] would be killed in a very big way and a very humiliating

way. Humiliating to him and his family." In the ceiling area, investigators found sharpened objects that could be used as tools or weapons.

The prosecution also presented expert testimony to explain the term "dim mak," which Kipp had used in the September 15th letter to explain how he killed Howard. The expert explained that the term "dim mak" literally means "death touch," referring to strikes at pressure points to cause unconsciousness or death.

## 2. Defense's Case in Mitigation

The defense presented a substantial mitigation case during the penalty phase, including dozens of witnesses to testify to Kipp's difficult upbringing and expert testimony regarding the history of the Blackfeet Tribe, of which Kipp is a member. The defense also called a psychologist to provide an expert opinion on how challenging aspects of his life impacted his development.

The jury heard evidence of the Blackfeet Tribe's bloody history in the U.S. In the late 1700's, the Tribe was a nomadic people who hunted buffalo and lived in teepees. After Americans began settling and taking over the fur trade, disease and alcohol spread across the Tribe. Although their territory was defined by treaty with the United States as of 1855, a gold rush in Montana resulted in invasions and encroachments on their land. In response to Blackfeet resistance, a group of soldiers massacred a peaceful encampment of Blackfeet. Joe Kipp, a part-Native American scout who assisted the soldiers during the attack, tried to stop the attack after realizing at the last minute that the group was peaceful. The tribe's chief was killed in the massacre, and Joe Kipp adopted one of the chief's sons, who

would become the grandfather to John Kipp, Martin Kipp's adoptive father.

After buffalo began to disappear from Blackfeet lands, the Tribe suffered starvation and at least 600 died during the winter of 1882–1883, leaving a small population of around 2,500. The Tribe's reservation in Montana was reduced in size, and the Bureau of Indian Affairs began to adopt harsh regulations aimed at assimilating Native Americans into White society. When the tribes were allowed to decide whether to allow the sale of alcohol on their lands, the Blackfeet opted to permit alcohol, exacerbating the alcoholism that had developed among their members returning from World War II. By the time of Kipp's trial in 1989, 6,000 Blackfeet lived on the Montana reservation, with an unemployment rate of 60 to 70 percent and an annual family income of $5,000 per year (less than a third of the statewide average of $18,000). Members who left the reservations often experienced low esteem and lost the support of their communities.

Kipp was born on the Blackfeet Reservation in 1958. His birth mother, Mary Still Smoking, was a "nervous" and "paranoid" alcoholic, who was "out drinking most of the time." Kipp first lived with his maternal grandmother, where 12 to 14 children all shared a filthy, two-room house. The children were neglected, and inebriation and fighting were common in the house. A psychologist testified that these conditions caused Kipp to view the world as an insecure and threatening place and to develop distrust, fear of people, and sensitivity to rejection or abandonment.

When Kipp was 23 months old, child welfare workers removed him from the house and placed him with John and Mildred (also known as Bobbie) Kipp, who were also members of the Blackfeet Tribe. They lived on a family

ranch within the reservation that was isolated from the rest of the community. John Kipp was a large and muscular man, and a decorated United States Marine Corps serviceman during World War II. John Kipp was a demanding perfectionist who always wanted things done his way. When Kipp arrived, he was small and malnourished, his head had been shaved off because he had lice, and he had a skin disease called impetigo. John Kipp at first was unwilling to accept Kipp into his family, but, after six months, he began to treat Kipp as his son. Kipp idolized his adoptive father and tried to live up to his expectations. The psychologist testified that Kipp was not given the freedom needed to develop internal controls on his behavior. As a result, Kipp had difficulty distinguishing his own wants and values from John's.

Still, up through his teenage years, Kipp was seen as "friendly and well mannered," and an honest, hard worker. He attended high school in Montana on the Blackfeet reservation, where he was viewed as gentle, shy with girls, and a "warm, loving, and respectful young man." He competed in cross-country, and his coach described him as being courteous, trustworthy, and an "all-around good kid to coach." John also trained Kipp in boxing.

In 1973, when Kipp was in a car with his uncle and 11-year-old cousin Billy, the car crashed and Billy was killed. John Kipp was fond of Billy and took the incident hard; he felt responsible because he had sent them to get seed grain when the accident occurred. John began to drink whiskey excessively and suffered a stroke. John's alcoholism also led his family relationships to deteriorate. John physically abused Bobbie and Kipp; he broke two of Bobbie's fingers when he slammed a door shut on her hand. He became aggressive and rough, spent his time in bars, and started an

affair.  Bobbie eventually moved away and divorced John, who remarried.

The psychologist testified that Kipp's sense of identity was rooted in his relationship with John.  John's deterioration was profoundly frightening to Kipp and resurfaced his fears and insecurities.  Kipp was in a constant state of emotional turmoil and "lost heart," leading him to give up boxing.  Kipp moved to his uncle's house in Spokane, Washington during his senior year of high school. When he was 19, he received news that John had died.  Kipp left immediately and drove all night to the ranch.  Following John's death, a dispute arose over the division of assets between John's family and John's widow.  Kipp was caught in this conflict and unprepared to deal with it.  Bobbie ended up with nothing, and Kipp received $13,000.

Kipp enlisted in the United States Marine Corps, where the discipline and high standards paralleled his relationship with John.  Although Kipp was considered an outstanding recruit during boot camp, his performance plummeted when he was assigned a desk job in Okinawa.  Kipp developed an attitude problem, stole some items, and spent time in the brig.   He also began to abuse alcohol, cocaine, and methamphetamine.  He was transferred to California, where he raped June Martinez in June 1981.  In the following month, he left his military post without leave and returned to the Blackfeet reservation in Montana.  He began to date a woman who testified that Kipp was a "gentleman" who was "really good to her."

Kipp was arrested for raping Martinez in August 1981. While in custody awaiting trial, he was sexually assaulted by other inmates.  The experience was profoundly frightening to Kipp, and he coped by hiding his weakness and vulnerability.   Still, Kipp adjusted well during his

incarceration, and Bobbie visited him during that time. But when he was released in 1983, Kipp continued to lack direction or identity, and he felt that he had no one with whom he could discuss his problems. He continued to abuse alcohol, cocaine, and methamphetamine. The defense presented an expert psychopharmacologist who testified that chronic use of these drugs can result in paranoia and is also associated with violence and suicide.

By the time of the penalty phase of the trial, the defense psychologist had interviewed Kipp five times between 1984 and 1989. Kipp had admitted to killing Frizzell and Howard, and he expressed shame, sorrow, and regret for his actions. Kipp explained to the psychologist that, when he wrote the September 15th letter to his wife denying that he had any remorse, he was upset and angry about what had happened during his trial for the murder of Howard.

The defense called a number of additional witnesses—Kipp's family and friends—who expressed their love for Kipp and urged the jury to spare his life. Another expert witness testified about the California prison system and described how individuals sentenced to life without parole are confined in small modules, where they are constantly surveilled and escape is virtually impossible. The expert also testified that individuals sentenced to life terms tend to be model prisoners, especially after the age of 40.

### 3. Prosecution's Rebuttal

The prosecution introduced a letter from Kipp to his wife from September 9, 1987 (the "September 9 letter")**[3]**, in which he described his machinations for violence and rape against the female deputies and the district attorneys and their families. The letter had several references to Satan, including that Satan had helped rejuvenate his energy to carry out his intentions.

The jury deliberated for about three days and returned a death verdict. The trial court denied Kipp's motion for a new trial and imposed a death sentence.

### C. Post-Trial Proceedings

On automatic direct appeal, the California Supreme Court affirmed Kipp's conviction and sentence in a reasoned opinion, issued on November 1, 2001. *People v. Kipp*, 26 Cal. 4th 1100, 33 P.3d 450 (2001). The U.S. Supreme Court denied certiorari. *Kipp v. California*, 537 U.S. 846 (2002).

Kipp filed his first state habeas petition on December 4, 2000, which the California Supreme Court summarily denied on November 12, 2003. He filed a second state habeas petition on November 5, 2004, and three days later filed a habeas petition in federal court, which the district court stayed pending the state court's disposition. On June 28, 2006, the California Supreme Court issued another summary denial. He filed an amended federal habeas petition and moved for an evidentiary hearing. The district

---

**[3]** Throughout the record, this letter is variously referred to as the September 7 or September 9 letter. We refer to the letter as the September 9 letter for consistency.

court denied the evidentiary hearing and denied Kipp's petition. The court granted a certificate of appealability ("COA") as to two of Kipp's claims. Kipp timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 2253, and we review de novo the district court's denial of habeas relief. *Godoy v. Spearman*, 861 F.3d 956, 961–62 (9th Cir. 2017) (en banc). Kipp's federal habeas petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because it was filed after April 24, 1996. *See White v. Ryan*, 895 F.3d 641, 665 (9th Cir. 2018). Under AEDPA, we may not grant relief on any claim adjudicated by the state court on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). Where a state court summarily denies a claim without reasoning, we must "determine what arguments or theories supported or . . . could have supported[] the state court's decision[.]" *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Relief is warranted when the state's adjudication was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The district court granted a COA for two of Kipp's claims: (1) that the admission of Kipp's references to Satan in two letters violated his First Amendment rights,[4] and

---

[4] The district court did not grant a COA for another reference to Satan during the penalty phase. A deputy testified that Kipp swore "to [the deputy] and his savior, Satan," that he would kill a sergeant "in a

(2) that his counsel was ineffective for failing to adequately litigate the admissibility of those references. We treat Kipp's opening brief, which addresses several uncertified issues, as an application to expand the COA, *see* Fed. R. App. P. 22(b)(2) and Ninth Cir. R. 22-1(e), and grant the application as to two additional claims: (1) that the jury's use of the Bible during deliberations violated his right to a fair trial and (2) that Kipp's counsel was ineffective by failing to adequately investigate and present mitigating evidence during the penalty phase. *See* 28 U.S.C. § 2253(c)(2). We decline to grant a COA as to the remaining claims.

## III.  Discussion

### A. First Amendment Claim

Kipp argues that the state's admission of his references to "Satan" violated his First Amendment rights, as set forth by the Supreme Court in *Dawson v. Delaware*, 503 U.S. 159 (1992). Because we find that any constitutional error was harmless, we affirm the district court's denial of habeas relief on this claim.

### 1.

Kipp's First Amendment claim encompasses both the guilt and penalty phase. During the guilt phase closing argument, the prosecutor referred to the September 15 letter that Kipp wrote to his then-wife as a "significant piece of circumstantial evidence," and he read an excerpt to the jury:

---

very big way." Because "the admissibility of this brief reference to Satan is not preserved for [state] appellate review[,]" *Kipp*, 26 Cal. 4th at 1135, he is procedurally barred from raising it here, and we decline to grant a COA.

Page 7 reads in part: "I killed, raped, sodomized, beat, swore, and laughed at those fucking no-good bitches. Yeah, it felt great, because neither deserved to live anymore. . . . The other little tramp played it off as a college sweetheart. Hell, she was anything but that, and a loose fuck to boot. Well, Satan's licking both those bitches up now and laughing."

The prosecutor then argued:

Ladies and gentlemen, that constitutes an admission, a rather chilling admission. Part of that statement that I just read to you alludes to an act that the defendant may or may not have committed elsewhere. . . . [Y]ou can accept that as an admission, a chilling admission of what occurred in Room 162, the Ramada Inn, on September 17, 1983.

The next day, after adjourning for the evening, the prosecutor resumed his argument by referencing the "rather indelible impression of the looks in [the jury's] eyes as [he] read that letter." He apologized for reading the "distressing" language from the letter but reminded the jury that it was Kipp's "unpleasant" language, not his own. A redacted copy of the letter was ultimately admitted into evidence, containing one additional reference: "In our next world we will celebrate and be on top, first in line to persecute and execute those would be heaven goers! (We are coming Home Satan!)"

During the penalty phase, the prosecutor again used the September 15 letter to cross-examine the defense expert.

The court also admitted the September 9 letter over the objection of Kipp's counsel, allowing certain portions to be redacted but leaving intact the Satan references. In his sentencing closing argument, the prosecutor said that he would not recite the September 15 letter again "because the language was rough, to say the least," but argued that it undermined Kipp's claims of remorse. He then read a portion of the September 9 letter to the jury:

> "I'd rape and sodomize every woman bitch deputy and gouge their eyes out. But I would let them live as invalids. Yeah, Satan will lick them all up in a tredge [sic] of horror. They better not ever give[] me the opportunity to escape, because I'll associate myself with a terrorist group and really go on a spree. I'd kill every DA and his family, deputies, men and women alike, and I'd gouge every one of their . . . fucking eyes out. After I got to 400 to 500 killings of this type, I'd also incorporate some ninja-type murders by poison. Yeah, I don't believe in God anymore, because their [sic] isn't one who has ever helped me. But Satan has helped me rejuvenate my energy in a working manner. Don't ever underestimate my intentions, babe, that's all I can say."

He argued:

> . . . When you consider these two letters with the language the defendant used in conjunction with that one 1988 escape attempt, you have a pretty consistent notion

of what is going on in the defendant's mind
with regard to remorse.

The prosecutor concluded, "This defendant, this real Martin Kipp, has murder in his heart, has Satan [in] his soul. And he had the life's blood of Tiffany Frizzell and Antaya Howard on his hands."

The defense attempted to contextualize the letters by urging that Kipp had lost all hope, explaining that when Kipp wrote, "Yeah, I don't believe in God anymore because there isn't one who has ever helped me," it exemplified how he was "a man who is down as low as you can go."

**2.**

The Supreme Court in *Dawson v. Delaware* held that the admission of a defendant's beliefs and associations at sentencing violates the First Amendment where it has "no relevance to the sentencing proceeding." 503 U.S. at 166. In *Dawson*, the prosecution introduced evidence at sentencing of the petitioner's affiliation with the Aryan Brotherhood, as well as evidence suggesting his belief in Satan. *Id.* at 162. To supplement the Aryan Brotherhood evidence, the parties agreed to a stipulation that read: "The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Id.*

The Court held that the evidence was inadmissible because it "was not tied in any way to the murder," especially where "the prosecution did not prove that the Aryan Brotherhood had committed [or endorsed] any unlawful or violent acts" such that it would be relevant to

any aggravating circumstance. *Id.* at 166. In so holding, the Court rejected application of a "principle of broad rebuttal" in this case that would allow introduction of the evidence solely because Dawson put his character at issue in mitigation. *Id.* at 167–68. "[B]ecause the evidence proved nothing more than Dawson's abstract beliefs," and because it "was employed simply because the jury would find these beliefs morally reprehensible," its introduction violated Dawson's constitutional rights. *Id.* at 167.

Kipp contends that, as in *Dawson*, the evidence of his references to Satan was not connected in any way to his crime, and thus its sole relevance was to show that his beliefs were morally reprehensible. As such, he argues, the admission of the evidence violated his First Amendment rights and his conviction must be reversed.

As a preliminary matter, the parties disagree as to the standard of review that we must apply. Kipp contends that our review must be de novo because the state court either unreasonably applied *Dawson*, *see* 28 U.S.C. § 2254(d)(1), or unreasonably determined the facts by assuming that a belief in Satan represents an "abhorrent value system" that is unsupported by evidence in the record, *see id.* § 2254(d)(2). The state, on the other hand, argues that AEDPA deference applies. We need not resolve this issue because we find that, even on de novo review, Kipp's claim fails. We affirm the denial of habeas relief because, even assuming that the state's admission of Kipp's references to Satan violated his First Amendment rights, the error did not have a "substantial and injurious effect or influence in

determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).[5]

During the guilt phase, the Satan references were brief and minor. The prosecutor read aloud a brief portion of Kipp's September 15th letter that included "Well, Satan's licking both those bitches up now and laughing." The prosecutor later reminded the jury of "the rather indelible impression of the looks in your eyes as I read that letter." But there is no indication that the jury's reaction was to the brief mention of Satan rather than to the contents of the letter, which included Kipp's gruesome and deeply disturbing descriptions of violence. Moreover, while discussing how distressing the language was, the prosecutor focused on the crime rather than any religious implication of the Satan references: "[M]urder is an unpleasant thing by it's very nature. . . . There's nothing pretty about it." In the totality of the prosecutor's lengthy closing, the references to Satan comprised a relatively short section that went to Kipp's consciousness of guilt.

On the other hand, the evidence supporting Kipp's conviction was overwhelming. Kipp's fingerprints were found on a telephone in the room where Frizzell's body was discovered and on a book owned by her that was later discovered. *Kipp*, 26 Cal. 4th at 1110–11. Kipp also pawned

---

[5] We reject Kipp's contention that a *Dawson* violation is "structural" and thus not subject to harmless error review. Kipp cites no supporting authority, and we are unpersuaded that this type of constitutional violation satisfies the rationales for a structural error discussed by the Supreme Court in *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)) (explaining that "the defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself'").

a personal stereo and a cassette player that Frizzell's mother identified as her daughter's. *Id.* at 1111. Finally, the prosecutor had Kipp's own admissions in the September 15th letter that detailed how he "killed, raped, sodomized, beat, swore and laughed at" the victims. *Id.* The defense called no witnesses and offered no exhibits during the guilt-phase trial. *Kipp*, 26 Cal. 4th at 1112. Accordingly, the two references to Satan introduced during the guilt phase are wholly inadequate to show a "substantial and injurious effect" on the jury's guilty verdict.

The penalty phase likewise involved an insurmountable sum of aggravating evidence. Kipp argues that the centrality of the statements in the closing arguments both highlights their importance and exacerbated their impact. Certainly, the penalty phase presents a closer question than the guilt phase. The September 9th letter was introduced for the first time during closing argument and the prosecutor used the letters to argue that "this real Martin Kipp, has murder in his heart, [and] has Satan in his soul." The jury specifically requested to see the September 15th letter during the penalty phase deliberations. And the trial court did not take steps to ameliorate any impermissible inferences that the jurors might have drawn from the Satan references. *See, e.g.*, *United States v. Fell*, 531 F.3d 197, 230–31 (2d Cir. 2008) (finding no prejudice where the trial judge gave a jury instruction to ignore the defendant's religious beliefs and required each juror to certify on the special verdict form that they had followed that instruction).

Yet, on the other hand, the aggravating circumstances were overwhelming, and the prosecutor's methodical recounting of Kipp's continuous history of violence was particularly devastating. The prosecutor recalled the in-court testimony of Martinez, who had survived after Kipp

kidnapped, raped, and choked her in 1981. Martinez testified that Kipp had strangled her "to the point that her body began to go limp, her eyes started to roll back in her head, and she had one remaining thought which was 'Dear God, please don't let me die like this.'" The prosecution's narrative continued with Kipp's violent assault and attempted rape of Newman in 1983, whom Kipp had also choked, but who managed to escape through police intervention. The prosecutor reminded the jury that Newman was afraid to press charges because Kipp had threatened to kill her and her son. The prosecutor then described Kipp's brutal murder of Howard, merely three months after he killed Frizzell, and reminded the jury of a photograph showing her decomposing body in the car. He also described the violent way in which Kipp beat Howard before strangling her to death. Finally, the prosecutor described Kipp's attempted escapes from jail, and Kipp's assertion that they were lucky he was caught because he was out to kill. The letters themselves, separate and apart from the Satan references, paint a picture of a killer who not only showed no remorse, but who threatened to commit other depraved acts of violence and torture in the future. In short, the references to Satan are too minor in light of the other evidence to have "had substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 638. We thus affirm the district court's denial of habeas relief for this claim.

## B.  Ineffective Assistance of Counsel

Kipp argues that his Sixth Amendment right to counsel was violated because his counsel performed deficiently in a way that prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the state court adjudicated his ineffective assistance of counsel ("IAC")

claim "on the merits for failure to state a prima facie case," we review under AEDPA deference. *See* 28 U.S.C. § 2254(d). Our examination of counsel's performance "must be highly deferential," *Strickland*, 466 U.S. at 689, and, when conducted through AEDPA's lens, our review is "doubly deferential," *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam)). Because the state issued summary denials as to Kipp's IAC claims, we must first "determine what arguments or theories supported or . . . could have supported[] the state court's decision," and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.

### 1.

Kipp contends that his trial counsel "failed to competently litigate the admissibility of Kipp's oral and written references to Satan." Specifically, Kipp argues that counsel erred by objecting to the admission of the references to Satan on evidentiary rather than constitutional grounds. But because *Dawson* had not yet been decided, it is questionable whether any objection on constitutional grounds would have been successful. *See Strickland*, 466 U.S. at 688 (holding that deficient performance means that "counsel's representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms"). Regardless, we need not decide whether counsel's performance was deficient because any error was clearly harmless. As we explained above, the admission of the Satan references could not have "had substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 638.

Accordingly, Kipp cannot meet the higher *Strickland* standard of prejudice, requiring a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694; *see Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995) (explaining that the *Strickland* test for prejudice imposes a "higher burden" on the defendant than the *Brecht* standard). We therefore affirm denial of habeas relief on this claim.

**2.**

Kipp also alleges that his trial counsel was ineffective during the penalty phase by failing to adequately investigate and present mitigating evidence regarding his life. He argues that a more thorough investigation would have uncovered "critical information about Kipp's history of prenatal exposure to alcohol, neglect as an infant, severe physical and emotional abuse and exposure to domestic violence . . . and escalating reliance on drugs and alcohol." We affirm the district court's denial of this claim because the California Supreme Court could have reasonably found that trial counsel's performance was neither deficient nor prejudicial to Kipp's case. *See Strickland*, 466 U.S. at 687.

As for deficiency, Kipp argues that trial counsel failed to timely conduct a mitigation investigation, which led to the defense missing important witnesses and to inadequate preparation of the witnesses that were put on the stand. Kipp's original counsel James Egar declared a conflict on January 15, 1986. Thereafter, when John Yzurdiaga and Jeffrey Brodey were appointed to take over, they inherited an incomplete investigation and considered Laurie Poore, the original mitigation investigation specialist, to be "in charge" of the mitigation investigation. However, they did not contact Poore until almost three years after Egar had been removed and after jury selection had already begun.

Poore stated in a declaration that she was "greatly disturbed" that counsel had waited so long to contact her, and that "it became apparent . . . that no one had done any work on the penalty phase investigation" since they were appointed as counsel. Similarly, the social historian, Craig Haney, who had interviewed potential witnesses in 1985 and 1986, did not resume work until after the attorneys contacted him in 1988. Thus, Kipp argues, counsel's "neglect of the mitigation investigation until Kipp's trial had begun" was deficient performance.

Kipp's framing of this delay, however, paints an incomplete picture of the totality of the mitigation investigation and evidence that was presented to the jury at the penalty phase. As an initial matter, Kipp had a hand in creating the "conflict" that arose with Egar by becoming romantically involved with Egar's paralegal and necessitating a transition midstream to Yzurdiaga and Brodey.[6] Thereafter, while the new attorneys waited a long time to begin the penalty phase, Poore acknowledged that a significant amount of work and investigation had already been conducted. Egar had previously "directed the penalty phase investigation and took an active role supervising" the investigators. The new attorneys had Egar's files and were in frequent contact with him during their preparation.

This case thus presents facts far different from the cases cited by Kipp. For example, in *Williams v. Taylor*, 529 U.S. 362, 395 (2000), the Court found that counsel's performance

---

[6] As Poore explains it, she began to catch on that a paralegal on the case "had become romantically involved" with Kipp, in part because the paralegal began to dress "like what she thought Native Americans looked like." Egar fired the paralegal over the improper relationship, and Kipp may have been persuaded by the paralegal to replace Egar.

was deficient where preparation for sentencing did not begin at all until a week beforehand. In *In re Lucas*, the California Supreme Court held that counsel was deficient because they entirely failed to follow-up with witnesses that had suggested alternative theories of mitigation. 33 Cal. 4th 682, 725 (2004). By contrast, here, the asserted "delay" did not impede counsel from presenting a substantial case in mitigation at the penalty phase. Poore was able to reestablish contact with her witnesses, to persuade twenty-one lay witnesses to travel to California and testify, and (despite some friction with the new attorneys) "conduct[] the [in-person] interviews with all of the remaining witnesses as [she] had planned."

Kipp cites *Bemore v. Chappell*, 788 F.3d 1151 (9th Cir. 2015), to argue that counsel may still be deficient even if a substantial case in mitigation was presented at trial. In *Bemore*, we held that counsel was deficient despite having presented over forty witnesses at trial. However, counsel had been aware of a potential mental impairment theory suggested by a forensic psychologist but had "truncated" the inquiry and "put his report in the back of a drawer." *Id.* at 1171–72. By contrast, and as discussed in more detail below, the allegedly overlooked evidence in this case was largely duplicative of theories of mitigation that were in fact presented at trial, detailing the drug and alcohol use, poverty, and abuse rampant in Kipp's childhood into his adulthood. Counsel here did not completely overlook a new, different theory of mitigation. Accordingly, the state court could have reasonably rejected Kipp's IAC claim for failing to adequately establish deficient performance.

Additionally, the California Supreme Court could have reasonably concluded that any deficiency in counsel's performance did not prejudice the result. To determine

whether the failure to investigate and present mitigating evidence prejudiced the defendant, "it is essential to compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (internal citations omitted).

Here, the defense put forth a substantial case in mitigation that focused on the tragic circumstances of Kipp's personal history. Kipp's proffered "new" evidence is not meaningfully different in kind, but rather in detail, and we hold that any deficiency did not "undermine[] the reliability of the result." *See Strickland*, 466 U.S. at 693.

First, Kipp points to witnesses who could have more clearly demonstrated that his biological mother, Mary Still Smoking, drank alcohol while pregnant with him. This evidence is not meaningfully different from the extensive evidence of her drinking and alcoholism that was in fact presented.

Second, Kipp argues that the attorneys failed to accurately paint a picture of his childhood abuse. Contrary to the testimony presented at trial that John did not physically abuse Kipp as a child, Kipp notes that witnesses could have detailed specific instances of abuse during his childhood. However, Mildred, John's wife, denied that John hit Kipp, and her new declaration only acknowledges that he "switched from beating [her] to beating" Kipp before he started high school. At the very least, the additional evidence from extended family and friends would have contradicted the testimony of Mildred herself at trial. And, as the district court noted, the jury did in fact hear about

several incidents of disturbing and violent physical abuse by John, such as when he "choked [Petitioner] into unconsciousness for ten to twenty seconds," or when, two days later, he caused Kipp "occipital head trauma because John hit Petitioner's head against a nail on a wall."

Kipp also argues that the attorneys could have presented much more detailed evidence regarding his drug and alcohol abuse during his teenage years and escalating through his military service. This testimony would have merely duplicated the ample testimony that was already presented regarding Kipp's extensive drug and alcohol abuse. Moreover, as the state argues, not all juries would view this detailed evidence of drug and alcohol abuse to be mitigating.

In sum, the evidence that Kipp puts forth on habeas review largely duplicates the evidence that was in fact presented at trial, while any new information does too little to counteract the considerable case in aggravation. Because "fairminded jurists could disagree" whether the addition of this information would have a "reasonable probability" of changing the outcome, the district court properly denied this claim under AEDPA deference. *See Richter*, 562 U.S. at 102; *Strickland*, 466 U.S. at 695.

## C. Juror Misconduct During the Penalty Phase

Kipp alleges that one of the jurors brought a Bible into the jury room and discussed various passages with the other jurors during the penalty phase deliberations. Kipp relies on

the declaration[7] of juror Algertha Rivers, who stated, in relevant part:

> I recall that during penalty phase deliberations a female juror with dark, shoulder-length hair brought in a Bible and read it to us. She talked about several verses in the Bible, which she told us would help us in making a decision. The jurors talked about standing in judgment of another human being. There was also discussion of the verses which state, 'an eye for an eye' and 'judge not lest ye be judged.' A little over half of the jurors had a religious background and strong religious beliefs.

Kipp argues that injecting Bible verses into the jury room constitutes juror misconduct because the jury improperly considered "extraneous evidence," and that the state failed to show the misconduct was harmless. Because the state court denied this claim "on the merits for failure to state a prima facie case for relief," AEDPA deference applies to our review of this issue.

The *Mattox-Remmer* framework set forth by the Supreme Court governs juror misconduct claims involving consideration of extraneous evidence during deliberations:

> At step one, the court asks whether the contact was "possibly prejudicial," meaning

---

[7] We agree with Kipp that the declaration is admissible under Rule 606(b) of the Federal Rules of Evidence, which permits juror testimony about the consideration of extraneous evidence during deliberations but not about the effect of such evidence on the verdict.

> it had a "tendency" to be "injurious to the
> defendant." If so, the contact is "deemed
> presumptively prejudicial" and the court
> proceeds to step two, where the "burden rests
> heavily upon the [state] to establish" the
> contact was, in fact, "harmless."

*Godoy*, 861 F.3d at 959 (quoting *Mattox v. United States*,
146 U.S. 140, 150 (1892); *Remmer v. United States*,
347 U.S. 227, 229 (1954)). This two-step analysis
recognizes "the practical impossibility of shielding jurors
from all contact with the outside world, and also that not all
such contacts risk influencing the verdict." *Id.* at 967.

Kipp relies on cases that have applied the *Mattox*
presumption of prejudice at the second step of the inquiry,
but those cases involve extraneous influences that were
wholly different in kind. For example, in *Godoy*, a juror had
"'kept continuous communication' with the 'judge friend'
'about the case' and passed the judge's responses on to the
rest of the jury." *Id.* at 958. The other cases he cites involve
extraneous influences that are also easily distinguishable
from the Bible verses here. *See, e.g.*, *Parker v. Gladden*,
385 U.S. 363, 364 (1966) (per curiam) (bailiff's statement to
jurors); *Turner v. Louisiana*, 379 U.S. 466, 468–70 (1965)
(government witnesses interacting with jurors); *Remmer*,
347 U.S. at 228–30 (efforts to bribe juror); *Mattox*, 146 U.S.
at 150–53 (exposure to newspaper article).

Whether the introduction of the Bible is an
impermissible contact—the first step of the *Mattox-Remmer*
framework—is still an open question, at least in our circuit.
And circuits that have addressed this question are split.
*Compare Oliver v. Quarterman*, 541 F.3d 329, 339–40 (5th
Cir. 2008) (citing the Eleventh, First, and Sixth Circuits as

support that "[m]ost circuits have ruled that when a Bible itself enters the jury room, the jury has been exposed to an external influence") *with Robinson v. Polk*, 438 F.3d 350, 363–64 (4th Cir. 2006) (holding that the Bible is distinguishable from other types of external influences because "reading the Bible is analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence"). Our circuit has previously opted to resolve juror misconduct claims involving use of the Bible on prejudice grounds. *See, e.g.*, *Fields v. Brown*, 503 F.3d 755, 781 (9th Cir. 2007) (en banc); *Crittenden v. Ayers*, 624 F.3d 943, 973 (9th Cir. 2010). Here, we again find it unnecessary to decide the question of whether use of Bible verses during deliberation constitutes misconduct because the state court could have reasonably concluded that any error did not prejudice the jury's verdict.

To prevail on his claim in federal habeas review, Kipp acknowledges that any juror misconduct must have had a "substantial and injurious effect on the verdict." *See Fields*, 503 F.3d at 781; *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). Applying this standard, we have previously found harmless error in other cases with even more troubling use of Bible passages. In *Crittenden*, the court rejected a misconduct claim based on a juror's introduction of the passage "[w]ho so sheddeth man's blood by man shall his blood be shed." 624 F.3d at 973. In *Fields*, the juror cited the same passage, as well as "He that smiteth a man, so that he dies, shall surely be put to death." 503 F.3d at 777, n.15. The *Fields* court found no prejudice, in part, because there were Biblical verses in support as well as against imposition of the death penalty. *Id.* at 781. Here, the same logic applies: the verses mentioned in Rivers's declaration included both "an eye for an eye" and "judge not lest ye be judged," verses

tending to support opposing views. And, in *Fields*, "[m]ore importantly, the jury was instructed to base its decision on the facts and the law as stated by the judge, regardless of whether a juror agreed with it. We presume that jurors follow the instructions." *Fields*, 503 F.3d at 781–82. The jury received similar instructions here.

Moreover, the jury's sentence of death was supported by overwhelming aggravation evidence. As discussed above, the evidence of the extent of Kipp's violence against women was devastating, including raping and choking Martinez, violently assaulting and threatening to kill Newman, and brutally raping and killing Frizzell and Howard. Kipp twice tried to escape from jail, showed an utter lack of remorse, and threatened to commit violent atrocities again in the future. Weighing the overwhelming weight of this aggravating evidence against the purported juror misconduct, we conclude that any misconduct was harmless.

**AFFIRMED.**