**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RAYMOND ANTHONY LEWIS,

*Petitioner-Appellant*,

v.

CHANCE ANDES, Acting Warden, San Quentin State Prison,

*Respondent-Appellee*.

No. 19-99001

D.C. No.
1:03-cv-06775-
LJO-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted April 20, 2023
San Francisco, California

Filed March 12, 2024

Before: Mary H. Murguia, Chief Judge, and Morgan
Christen and Daniel P. Collins, Circuit Judges.

Opinion by Judge Christen

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of a federal habeas corpus petition filed pursuant to 28 U.S.C. § 2254 by Raymond Anthony Lewis, who was sentenced to death in 1991 after a California jury convicted him of the first-degree murder of Sandra Simms.

Lewis's certified claims involved only the penalty phase of his trial, where the State introduced evidence of Lewis's aggravating prior criminal acts, including a confession he made as a juvenile to involvement in a prior murder. Lewis argued that the state trial court's admission of his juvenile confession was unconstitutional, and that his trial counsel was ineffective in failing to present evidence of his innocence of the prior murder. Applying the deferential standard required by the Antiterrorism and Effective Death Penalty Act of 1996, the panel concluded that the California Supreme Court's affirmance of the trial court's admission of Lewis's juvenile confession was not contrary to or an unreasonable application of federal law, that it was not based on unreasonable factual determinations, and that Lewis's trial counsel's litigation of the evidence of the prior murder did not fall below an objective standard of reasonableness.

Lewis also contended that his trial counsel was constitutionally ineffective by failing to investigate, develop, and present certain mitigating evidence at the penalty phase of the Simms trial. Lewis argued that his trial

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

counsel should have presented additional evidence of his family's history, his rough upbringing, and his mental health issues. The panel concluded that Lewis failed to show that his trial counsel's performance fell below an objectively reasonable standard. Rather, counsel made reasonable strategic decisions at the penalty phase to ask for the jury's mercy and to appeal to any lingering doubt the jurors may have had about Lewis's guilt. The panel also concluded that much of the evidence Lewis said his trial counsel was ineffective in not introducing would have been cumulative of evidence that his counsel did introduce.

Lewis was eligible for the death penalty because the jury found that he had committed robbery in the course of the Simms murder. His uncertified claims attacked the sufficiency of the evidence of robbery based on the diminished mental capacity and inconsistent testimony of the State's eyewitness to the Simms murder. The panel declined to grant a certificate of appealability on these claims because the eyewitness's credibility was a question for the jury and his testimony was corroborated by several pieces of physical evidence.

## COUNSEL

Brian Abbington (argued) and Joan M. Fisher, and Brian Abbington, Assistant Federal Public Defenders; Heather E. William, Federal Defender; Federal Public Defender's Office, Sacramento, California; Joseph Schlesinger, Assistant Federal Public Defender, California Appellate Project, San Francisco, California; for Petitioner-Appellant.

Jeffrey Firestone (argued) and Sean M. McCoy, and Stephanie A. Mitchell, Deputy Attorneys General; Kenneth

N. Sokoler, Supervising Deputy Attorney General; James W. Bilderback II, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, Sacramento, California; for Respondent-Appellee.

---

## OPINION

CHRISTEN, Circuit Judge:

Raymond Anthony Lewis was sentenced to death in 1991 after a California jury convicted him of the first-degree murder of Sandra Simms. Lewis appeals the district court's denial of his federal habeas corpus petition filed pursuant to 28 U.S.C. § 2254.

Lewis's certified claims involve only the penalty phase of his trial, where the State introduced evidence of Lewis's aggravating prior criminal acts, including a confession he made as a juvenile to involvement in a prior murder. Lewis seeks federal habeas relief on the ground that the state trial court's admission of his juvenile confession was unconstitutional. He also argues that his trial counsel was ineffective in failing to present evidence of his innocence of the prior murder. The California Supreme Court affirmed the trial court's admission of the prior confession in a reasoned decision.

We conclude that the California Supreme Court applied the correct constitutional standard when it evaluated the admissibility of Lewis's juvenile confession at the Simms murder trial and that Lewis has not identified any clearly established federal law that the state court overlooked or

unreasonably applied. The state court also relied on reasonable determinations of fact when it affirmed the admission of Lewis's prior confession. In trying to relitigate the circumstances surrounding his juvenile confession, Lewis asks us to ignore AEDPA's deferential standard.

Lewis also contends that his trial counsel was constitutionally ineffective by failing to investigate, develop, and present certain mitigating evidence at the penalty phase of the Simms trial. Lewis argues that his trial counsel should have presented additional evidence of his family's history, his rough upbringing, and his mental health issues. We conclude that Lewis failed to show that his trial counsel's performance fell below an objectively reasonable standard. Rather, counsel made reasonable strategic decisions at the penalty phase to ask for the jury's mercy and to appeal to any lingering doubt the jurors may have had about Lewis's guilt. We also conclude that much of the evidence Lewis says his trial counsel was ineffective in not introducing would have been cumulative of evidence that his counsel did introduce.

Lewis was eligible for the death penalty because the jury found that he had committed robbery in the course of the Simms murder. His certified claims do not challenge that finding, but his uncertified claims attack the sufficiency of the evidence of robbery based on the diminished mental capacity and inconsistent testimony of the State's eyewitness to the Simms murder. We decline to grant a certificate of appealability (COA) on these claims because the eyewitness's credibility was a question for the jury and his testimony was corroborated by several pieces of physical evidence.

We affirm the district court's denial of the petition for writ of habeas corpus.

# I

## A

On June 6, 1988, in Fresno, California, Sandra Simms was repeatedly beaten with a wooden two-by-four and strangled to death. *People v. Lewis*, 28 P.3d 34, 46 (Cal. 2001). Earlier that night, Simms smoked cocaine with then-26-year-old Lewis and Lewis's girlfriend, Michelle Boggs, at the boardinghouse where Lewis lived. *Id.* at 45. Simms gave Lewis money to buy more drugs. Lewis left and met up with Paul Pridgeon, and the two set out to find a dealer.[1] *Id.* Simms became concerned that Lewis had stolen her money, and she went looking for Lewis. *Id.* When she found him, Simms, Lewis, and Pridgeon went to buy more drugs. *Id.*

Pridgeon was the prosecution's main witness during the guilt phase of the trial. *Id.* He testified that as the trio walked down an alley toward Pridgeon's apartment, Lewis picked up a two-by-four and hit Simms's head with it. *Id.* Pridgeon described Simms falling to the ground and Lewis striking her approximately six more times with the board. *Id.* Lewis then grabbed her throat and strangled her. *Id.* He also ripped open her blouse and took money from her bra. *Id.* Lewis told Pridgeon that he would kill him if he told anyone what Lewis had done, and the two men went to Pridgeon's apartment to smoke more cocaine. *Id.*

---

[1] Lewis notes that the record includes an incorrect spelling of Pridgeon's name as "Pridgon."

A passing motorist discovered Simms's body and reported it. *Id.* The Fresno police officer who responded found Simms lying on her back in a pool of blood, with a large cut on her face and "several razor-like cuts" on her neck. *Id.* The officer found Simms's blouse "partially open, with the two top buttons ripped off," and a $20 bill in her bra. *Id.* at 45–46.

The next morning, Pridgeon went to the police. He told them that Lewis had killed Simms, and he led a detective to a chipped two-by-four that contained traces of human blood. *Id.* at 46. A "wood splinter found in Simms's hair fit the chipped end of the two-by-four," but testing of the blood on the two-by-four was inconclusive. *Id.*

Police arrested Lewis that same morning at the boardinghouse where he lived. A detective testified that Lewis was wearing blue sweatpants and put on a green jacket and a pair of women's tennis shoes before they left the boardinghouse for the police station. *Id.* There was blood on the shoes that "matched Simms's blood and that of approximately 2 percent of the population." *Id.* There was also blood on the sweatpants and jacket, "but criminologists could not determine if the blood was human blood." *Id.*

A pathologist testified that Simms's injuries were consistent with being hit by a board and strangled. *Id.* "[S]trangulation was the main cause of death, with cerebral contusions from . . . basal skull fractures as a second or contributing cause." *Id.*

At trial, the defense case focused on attacking Pridgeon's credibility and challenging the reliability of the physical evidence. *Id.* at 46–47. The defense presented expert testimony "that Pridg[e]on suffered from mental disorders, mild mental retardation, and substance abuse." *Id.* at 46.

"Experts testified that Pridg[e]on's capacity to perceive and recollect Simms's killing was impaired, and that he made up information to fill in gaps in his memory." *Id.* In rebuttal, the State's expert witness conceded that Pridgeon's mental capacity was at about the level of a seven-year-old. Nevertheless, the State's expert testified that Pridgeon had the capacity to "relate the facts as he observed them" the night Simms was killed.

The defense also identified inconsistencies between Pridgeon's testimony at trial and the testimony he gave at the preliminary hearing. *Id.* at 47. For example, Pridgeon testified at trial that he tried but failed to warn Simms that Lewis was going to attack her and that Lewis strangled Simms, but he did not mention these facts at the preliminary hearing.[2] *Id.* at 49. Based on numerous inconsistencies, defense counsel moved to strike all of Pridgeon's testimony. The trial court denied the motion to strike. *Id.*

Lewis testified on his own behalf at trial. *Id.* at 46. He told the jury that the clothes and shoes he was wearing when he was arrested were picked out by a detective and did not belong to him. *Id.* at 47. Lewis also stated that he had seen Pridgeon wearing the jacket and shoes. *Id.* Lewis denied harming Simms and stated that he last saw her outside Pridgeon's apartment, where she got into a Cadillac with an unknown man and said she would return in 20 to 25 minutes. *Id.* at 46.

The jury deliberated for six days and on November 26, 1990, it found Lewis guilty of first-degree murder and

---

[2] While Pridgeon did not explicitly state at the preliminary hearing that Lewis strangled Simms, it appears he made gestures indicating that Lewis "had both of his hands extended in a downward direction" during the attack.

robbery.  The jury also found that Lewis's robbery of Simms was a "special circumstance," making him eligible for the death penalty.

## B

At the penalty phase, the State presented as factors in aggravation evidence of Lewis's prior crimes.  As factors in mitigation, the defense presented expert mental health testimony, testimony from Lewis's family about Lewis's character, and their pleas that he not be executed.  *Id.* at 47–48.  The defense also presented evidence of Lewis's positive adjustment to incarceration.  *Id.* at 48.

Lewis's criminal history included his involvement in the murder of A.Z. Rogers, which occurred in 1975 when Lewis was 13 years and 7 months old.[3]  *Id.* at 64.  Rogers was the brother of Lewis's mother's boyfriend.  *Id.* at 48**.**  The State's evidence showed that Lewis, "along with his two friends, poured gasoline and threw a lighted match into the car in which Rogers was sleeping."  *Id.* at 64.  Rogers died from smoke inhalation and second- and third-degree burns.  *Id.*

At the Simms trial, the State sought to introduce evidence of the Rogers murder to establish an aggravating factor under California Penal Code § 190.3(b), which instructs the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence."  Evidence of Lewis's

---

[3] While the California Supreme Court's opinion states that Lewis was 13 years and 9 months old, the murder occurred on April 28, 1975, and Lewis was born on September 16, 1961, thus making him 13 years and 7 months old at the time.  *See id.* at 64–65.

juvenile second-degree murder adjudication for killing Rogers was not itself admitted.[4]  *Id.* at 64.

Lewis first moved to exclude the State's evidence of the Rogers murder on the ground that there was insufficient proof that he understood the wrongfulness of his acts at the time of the murder.  *Id.*   The trial court rejected this argument.  *Id.*  The court instead submitted the question to the jury, which found beyond a reasonable doubt that Lewis understood the wrongfulness of his acts during the Rogers murder.  *Id.* at 64–66.   The California Supreme Court affirmed the trial court's ruling and held that "[t]here was substantial evidence supporting the finding that defendant knew the wrongfulness of his conduct at the time of the 1975 murder."  *Id.* at 66.  Lewis does not challenge that conclusion here.

Lewis also argued in the trial court that the confession he made to an investigator, that he had poured gasoline and thrown a lit match into Rogers's car, was inadmissible at the Simms trial because: (1) he did not knowingly and intelligently waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), during the juvenile interrogation; and (2) his confession was not voluntary.  *Id.* at 64.  Lewis requested a hearing outside the jury's presence for the Simms trial court to consider the admissibility of Lewis's confession to the prior murder.  *Id.* at 67.  The court granted Lewis's hearing request and heard testimony from Lewis, Investigator William Martin, and Detective Thomas Lean. *Id.*

---

[4] Lewis was tried in juvenile court for Rogers's death.  *Id.* at 64.  The juvenile court found that Lewis committed second-degree murder and confined him to the California Youth Authority.  *Id.*

Detective Lean testified to the court that, nine days after Rogers's death, he and Detective Arthur Christensen brought Lewis to the police station for questioning, along with the two boys who were with Lewis on the day of Rogers's death, Sylvester Green and Willis Randolph. *Id.* Detective Lean testified that he read Lewis his *Miranda* rights from a department-issued card. *Id.* at 68. The detective asked if Lewis understood each of his rights and whether he still wished to talk to the detectives. According to Detective Lean, Lewis responded "yeah"—or "ya," as it was spelled in Detective Lean's report—to both questions without "any overt hesitation." *Id.* at 68. Detective Lean "did not recall" Lewis asking to speak with his mother during the interrogation. *Id.*

Detective Lean recounted that Lewis first told the two interrogating detectives that "he last saw Rogers when Rogers was smoking a cigarette underneath the hood of his car." *Id.* at 67. Later, Detective Lean told Lewis "that arson investigators determined the fire originated from inside the car and not from under the hood." *Id.* Detective Lean testified that Lewis then provided a different version of what happened the day Rogers died: Lewis said that he and Sylvester Green were siphoning gas from Rogers's car, and Lewis threw the gas can at Green and it landed in the car. *Id.* at 67–68. Lewis accidentally knocked a cigarette out of Green's hand and it also landed in the car, igniting the fire. *Id.* at 68.

At that point in the interrogation, the detectives brought in Investigator Martin to aid them. *Id.* Like Lewis, Investigator Martin was a Black male, and the detectives thought Lewis would better relate to Martin. *Id.* Investigator Martin testified to the Simms trial court that he told Lewis "that Rogers was a 'nice man' and 'didn't deserve to die that

way,' and that 'this was something that was horrible and won't go away.'" *Id.* According to Investigator Martin, Lewis then admitted that he poured gas into Rogers's car while Rogers slept and then threw a lit match into the car. *Id.* Lewis told the investigator that he lit the fire "because Rogers had slapped him after he had tried to take Rogers's watch." *Id.* Lewis's confession was not reduced to a written statement and was not audio or video recorded.

The Simms trial court also considered the testimony Lewis gave at the preliminary hearing in the Simms case. Lewis testified that he remembered being read his *Miranda* rights when he was questioned about the Rogers murder, but that he was scared and did not know what many of the words meant. *Id.* Lewis "admitted he gave three or four different stories regarding what happened" the day Rogers died, but he "denied telling detectives that he and [Green] were splashing each other with gas, which landed in the car, or that he was wrestling with [Green] and accidentally flipped a cigarette into the car, causing the fire." *Id.* Lewis testified that the detectives denied his requests to speak with his mother, telling him he would have to wait. *Id.* at 68–70. Lewis also testified that he stopped speaking with the detectives after he asked to speak with his mother. But when asked again about the sequence of events during the interrogation, Lewis stated that he gave his statement to the detectives both before *and* after he asked to speak to his mother.

The Simms trial court denied Lewis's motion to exclude his juvenile confession from evidence. The court concluded "that [Lewis's] confession was voluntary, and that he had made an intelligent and knowing waiver of his right to counsel." *Id.* at 65.

With Lewis's motion denied, the State was permitted to introduce to the jury its evidence of Lewis's involvement in Rogers's death. A fire captain and a fire marshal both testified that the fire was deliberately started. *Id.* at 64. An eyewitness testified that she saw Lewis and two others running away from the fire. *Id.* Investigator Martin testified that Lewis confessed to pouring gasoline and throwing a lit match into Rogers's car. *Id.*

The State's other aggravating evidence consisted of Lewis's involvement in three burglaries, including attacks on two men and the robbery of an 81-year-old woman; violent behavior against another inmate and an officer while in jail; involvement "in a number of purse snatchings"; and prior theft- and drug-related convictions. *Id.* at 47.

In mitigation, the defense offered testimony from two expert witnesses. Dr. Callahan, a psychiatrist, testified that Lewis suffered from antisocial personality disorder. *Id.* Based on his review of records from Lewis's prior mental health examinations, Dr. Callahan concluded that Lewis had been diagnosed with "paranoid schizophrenia with episodic violent behavior, impaired judgment, and borderline intelligence." *Id.* Dr. Callahan further testified that Lewis had not received proper treatment for his mental health conditions, that Lewis "lived in a very unstructured and unsupervised environment," and "that a structured environment and medication would help prevent [him] from acting out violently." *Id.* at 47–48. Dr. Adams, a psychologist for the defense, testified that Lewis "met the criteria for antisocial personality disorder." *Id.* at 48.

Lewis's family members testified on his behalf. His mother expressed that "she loved her son and would be extremely distraught if he were executed." *Id.* Lewis's sister

testified that her brother had changed while in jail, becoming more religious, and "that she would miss [Lewis] very much if he were executed." *Id.* Lewis's cousin also testified. She told the jury that Lewis advised young people to stay off drugs and that "she would miss him if he were executed." *Id.*

The defense also presented testimony from an employee of the sheriff's department, a correctional officer, and a jail employee, all of whom testified that Lewis was respectful in their interactions with him. *Id.* A death-row inmate testified that Lewis could become a counselor to other inmates while in prison. *Id.*

As to the Rogers murder, Odell Rogers, the brother of the victim in the Rogers murder, testified that he "was not afraid of" Lewis and that "he had warned [his brother A.Z.] about carrying gas in his car because he smoked and used matches." *Id.*

In its closing argument, the defense urged the jury to show sympathy and mercy to Lewis. "[D]efense counsel stressed defendant's troubled childhood, his diagnosis of paranoid schizophrenia, and his lack of parental guidance." *Id.* at 67. Counsel also pointed to Lewis's goal of becoming an inmate counselor, the emotion he showed in the courtroom, and his recent good behavior while incarcerated. Counsel argued that Lewis's recent good behavior showed his increasing maturity. The defense also argued that the jury should not consider the Rogers murder as an aggravating factor because Lewis did not know the wrongfulness of his conduct at the time. Counsel also tried to invoke lingering doubt as to whether Lewis murdered Simms by pointing out inconsistencies in the evidence and suggesting that Pridgeon lied during his testimony.

The jury deliberated for four days during the penalty phase before returning a verdict of death. The trial court imposed that sentence.

## C

Lewis filed a direct appeal. The California Supreme Court affirmed his conviction and sentence in 2001. *Id.* at 64. In 2003, the California Supreme Court summarily denied Lewis's first state habeas petition. Lewis timely filed a federal habeas petition under 28 U.S.C. § 2254 and a second state habeas petition. The district court stayed Lewis's federal petition pending resolution of the second state petition. In 2007, Lewis filed a third state habeas petition. In 2008, Lewis filed the operative first amended § 2254 petition in the district court. The petition raised 33 claims. The California Supreme Court summarily denied Lewis's successive state habeas petitions in 2010, and the district court found that Lewis's 33 claims were exhausted.

The district court denied Lewis's first amended petition in 2018. The court denied claims 1 through 19 and 21 through 33 on the merits and denied claim 20 as premature.[5] Lewis filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e), which the district court denied. The district court granted a COA only as to claims 14, 15, 16, 17, and 18. This appeal followed. Lewis challenges the district court's denial on the merits of his five certified claims and the district court's denial of a COA as to claims 2, 10, and 12.

---

[5] In Claim 20, Lewis contends that California's use of lethal injection to execute him would constitute cruel and unusual punishment in violation of the Eighth Amendment.

**II**

We review de novo a district court's denial of habeas relief. *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019). Because Lewis filed his federal habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). AEDPA prohibits a federal court from granting a petition for a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision . . . as the basis for its judgment." *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). When there is no reasoned state-court decision addressing a habeas claim, there is a rebuttable presumption that the state court adjudicated the claim on the merits. *See Harrington v. Richter*, 562 U.S. 86, 99–100 (2011). In that circumstance, federal courts must consider what arguments could have supported the state court's decision and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with a prior Supreme Court holding. *Id.* at 102.

A state court's decision is contrary to clearly established federal law if it "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable

from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Cook v. Kernan*, 948 F.3d 952, 965 (9th Cir. 2020) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). "Clearly established federal law" refers to the Supreme Court's holdings "as of the time of the relevant state-court decision." *Avena*, 932 F.3d at 1247 (alterations omitted) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)). A state court's decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08. A state court's factual findings are reasonable if "reasonable minds reviewing the record" could agree with them. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (alteration omitted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

"*Strickland v. Washington* and its progeny constitute the clearly established federal law governing claims of ineffective assistance of counsel." *Andrews v. Davis*, 944 F.3d 1092, 1107 (9th Cir. 2019) (en banc). To prevail on an ineffective assistance of counsel (IAC) claim, a defendant must establish that his counsel's performance was constitutionally deficient, and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland*'s "deficient performance" prong requires a defendant to show "that counsel's representation fell below an objective standard of reasonableness" such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687–88. In evaluating a lawyer's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  *Strickland*'s "prejudice" prong requires a defendant to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Under AEDPA, the primary issue is whether the state court adjudication of the *Strickland* claim was objectively reasonable.  *Woods v. Sinclair*, 764 F.3d 1109, 1131 (9th Cir. 2014) (citing *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007)).  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington*, 562 U.S. at 105 (citations omitted).  Thus, even if we would find, on de novo review, that petitioner can satisfy both *Strickland* prongs, "AEDPA requires that a federal court find the state court's contrary conclusions . . . objectively unreasonable before granting habeas relief."  *Woods*, 764 F.3d at 1132.

# III

## A

We affirm the district court's denial of Lewis's certified penalty-phase claims related to the admission of his confession to the Rogers murder.  Lewis contends that: (1) his confession to the Rogers murder was involuntary, uncounseled, and false, and his counsel in the Simms trial was ineffective for failing to preserve Lewis's claim that he requested to speak with his mother while being interrogated about the Rogers murder, which he asserts was tantamount

to a request for counsel; and (2) his counsel at the Simms trial was ineffective by failing to present credible evidence of his innocence of the Rogers murder.[6] We conclude that the California Supreme Court's affirmance of the trial court's admission of Lewis's juvenile confession was not contrary to or an unreasonable application of federal law, that it was not based on unreasonable factual determinations, and that Lewis's trial counsel's litigation of the Rogers murder evidence did not fall below an objective standard of reasonableness.

**1**

On direct appeal to the California Supreme Court, Lewis claimed that his confession to the Rogers murder "was not a product of his free will and his intelligent and knowing waiver of his Fifth Amendment rights." *Lewis*, 28 P.3d at 67. The California Supreme Court rejected these arguments, holding that Lewis's "confession was voluntary and followed a knowing and intelligent waiver of his *Miranda* rights." *Id.* at 69. The California Supreme Court's opinion is the last reasoned decision addressing these arguments.

The California Supreme Court wrote that, "[t]o determine whether a minor's confession is voluntary, a court must look at the totality of circumstances, including the minor's age, intelligence, education, experience, and capacity to understand the meaning and consequences of the given statement." *Id.* at 68 (citing *In re Eduardo G.*, 166 Cal. Rptr. 873, 879–80 (Cal. Ct. App. 1980) (citing *Gallegos v. Colorado*, 370 U.S. 49 (1962))). Applying the totality-of-the-circumstances test, the California Supreme Court

---

[6] These arguments correspond to Claims 17 and 18 of Lewis's first amended petition.

determined that "Detective Lean's testimony, which the trial court clearly credited, supported the court's finding that [Lewis] intelligently and knowingly waived his rights before voluntarily confessing," and that "neither Detective Lean's nor Investigator Martin's testimony was inherently so improbable as to be unworthy of belief." *Id.* at 69 (internal quotation marks and citation omitted). The court rejected Lewis's "contention that his young age and low intelligence precluded him from making a voluntary, knowing, and intelligent waiver." *Id.* "Although [Lewis] was less than 14 years old (and subsequent to the interviews was diagnosed a paranoid schizophrenic), he participated in his conversations with detectives, and indeed was keen enough to change his story when Detective Lean revealed that the fire originated from inside the car." *Id.* Moreover, "[b]oth Detective Lean and Investigator Martin testified that [Lewis] expressed no confusion either before or during the interview." *Id.* Lewis also argued that the trial court did not consider that, as of the time of his confession to the Rogers murder, he had had few contacts with the police. *Id.* The California Supreme Court concluded that this claim was "undermined by the subsequent witness testimony that [Lewis] received various citations and warnings from the police before 1975." *Id.* Finally, as to Lewis's argument that he asserted his Fifth Amendment right by requesting to speak to his mother during the interrogation for the Rogers murder, the court held that Lewis waived this claim by failing to raise it at trial. *Id.* at 69–70.

We understand Lewis to challenge the admissibility of his juvenile confession on due process grounds and as a violation of *Miranda*. Lewis argues that the California Supreme Court's ruling that his confession was voluntary "conflicts with clearly established federal law" because it

failed to account for Lewis's youth and failed to analyze the relevant factors as a whole.  More specifically, he argues that while the court "recited the general totality-of-circumstances test, it never mentioned the Supreme Court's additional special-care requirement for juvenile confessions."  Lewis further argues that the court improperly considered the circumstances of his confession in isolation.  Finally, in his view, the California Supreme Court improperly placed the burden on him to prove that his confession to the Rogers murder was involuntary and unaccompanied by a valid *Miranda* waiver.  We are not persuaded.

Having carefully examined the record, we conclude that the California Supreme Court's determination that Lewis's confession was voluntary and involved a knowing and intelligent waiver of his *Miranda* rights was not contrary to clearly established federal law.  The court applied the proper totality-of-the-circumstances test for evaluating the voluntariness of Lewis's confession, *see Withrow v. Williams*, 507 U.S. 680, 693 (1993), and acknowledged authority holding that the "burden to establish whether [an] accused's statements are voluntary is greater if the accused is a juvenile rather than an adult," *Lewis*, 28 P.3d at 69 (citing *In re Anthony J.*, 166 Cal. Rptr. 238, 244 (Cal. Ct. App. 1980) (first citing *In re Gault*, 387 U.S. 1, 55 (1967); and then citing *Gallegos*, 370 U.S. at 54)).  Even if the court had not included the latter citation, "[f]ederal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."  *Bell v. Cone*, 543 U.S. 447, 455 (2005).

Lewis relies on *J.D.B. v. North Carolina*, 564 U.S. 261, 268–69 (2011), to fault the California Supreme Court for omitting the "premise that custodial interrogations are inherently coercive especially where children—here a child

of color held in isolated custody without parent or counsel—are involved." *J.D.B* is of no help to Lewis because it was decided a decade after the California Supreme Court affirmed Lewis's conviction and sentence. *See Atwood v. Ryan*, 870 F.3d 1033, 1047 (9th Cir. 2017) (noting that "Supreme Court cases decided after the state court's decision are not 'clearly established Federal law' under § 2254(d)(1)"). The California Supreme Court considered Lewis's "young age," "low intelligence," prior "encounters with the police," and "subsequent . . . diagnos[is of being] a paranoid schizophrenic." *Lewis*, 28 P.3d at 69. Nothing in the court's opinion suggests that it considered each factor only in isolation, as Lewis argues. *See id.* Nor did the court shift the burden to Lewis to show that his confession was involuntary and unaccompanied by a valid *Miranda* waiver, as Lewis contends. Instead, the court recognized that the trial court "clearly credited" the testimony of the detectives who were present when Lewis was questioned and reasonably concluded there was no basis to reject the trial court's determination. *Id.*

To the extent Lewis argues that the California Supreme Court's totality-of-the-circumstances analysis was also an unreasonable application of clearly established federal law, that argument also fails. Lewis correctly points out that his relative youth, the absence of an attorney or parent in the interrogation room, and the mental health diagnoses he received near the time of the 1975 interrogation are factors that could support a conclusion that his *Miranda* waiver and confession were not knowing and voluntary. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Gallegos*, 370 U.S. at 54. But habeas review is "not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03. Assessing this claim through the deferential lens

AEDPA requires, the state court reasonably relied on the detectives' testimony, which adequately supported the finding that Lewis was advised of and understood his *Miranda* rights, was not denied a request to speak to counsel or a family member, did not appear upset or under the influence of alcohol or drugs, had breaks during the interrogation sessions, and was offered dinner. *See Berkemer v. McCarty*, 468 U.S. 420, 433 & n.20 (1984); *Fare*, 442 U.S. at 725. Investigator Martin, who witnessed Lewis's confession, testified that he appealed to Lewis's conscience, as opposed to employing intimidating tactics or making threatening or coercive remarks. *See Lewis*, 28 P.3d at 68; *Fare*, 442 U.S. at 727 ("The police did indeed indicate that a cooperative attitude would be to respondent's benefit, but their remarks in this regard were far from threatening or coercive."); *Ortiz v. Uribe*, 671 F.3d 863, 872 (9th Cir. 2011) ("[I]n the absence of threats or promises, mere psychological appeals to a petitioner's conscience [are] not enough to overcome his or her will." (citing *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996))). The California Supreme Court did not unreasonably apply federal law in concluding that Lewis's confession to Rogers's murder was voluntary and that he knowingly and intelligently waived his *Miranda* rights.

Lewis further contends that the California Supreme Court erred by affirming the trial court's admission of his confession to the Rogers murder as an aggravating factor at the penalty phase because the ruling "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In making this argument, Lewis relies on 28 U.S.C. § 2254(d)(2). We are not persuaded that any of the factual issues Lewis identifies entitle him to relief.

Lewis first argues that the California Supreme Court's statement that Lewis and his two companions "were not arrested but [were] under suspicion for Rogers's death" when the sheriff's department brought them in for questioning, *Lewis*, 28 P.3d at 67, is unreasonable in light of Lewis being "held in isolation in holding cells and likely handcuffed from morning until evening." Lewis reads too much into the state court's statement, which—when read in context—refers to the time period when Lewis was first transported to the police station, not the duration of his stay there. And even assuming the statement was erroneous, Lewis fails to explain how it was material to the California Supreme Court's admissibility analysis. *See id.* at 68–69.

Second, Lewis challenges the California Supreme Court's observation that, after Detective Lean read Lewis his *Miranda* rights and asked if he still wished to speak to the detectives, Lewis, "[w]ithout any overt hesitation, . . . replied yes, and did not express any confusion over the rights read to him." *Id.* at 68. Lewis stresses that the trial testimony shows that he responded "ya" or "yeah," not "yes," and "the revision of the actual response changes a 13-year old's answer into an adult's." Because the state court did not purport to be quoting Lewis's exact words and did not discuss or attribute any adult-like sophistication to Lewis's response, Lewis fails to show that the court's paraphrase was unreasonable.

Third, Lewis argues the California Supreme Court unreasonably determined that Lewis understood Detective Lean's *Miranda* warnings because it relied heavily on the detective's testimony, even though the detective was unable to recall his conversation with Lewis and only testified as to what he usually told juveniles when he questioned them. This argument overlooks that Detective Lean testified at a

preliminary hearing held during the penalty phase of the Simms trial in 1990 that he remembered advising Lewis of his *Miranda* rights during the Rogers investigation in 1975 and recalled obtaining Lewis's waiver, consistent with his "custom and practice." The California Supreme Court was not unreasonable in relying on Detective Lean's testimony, which the trial court credited.

Next, Lewis contends the California Supreme Court erroneously concluded that Lewis did not request to speak with his mother during the police questioning by crediting Detective Lean's testimony over Lewis's. Lewis argues that Detective Lean's testimony did not conflict with Lewis's testimony because the detective could not recall whether Lewis asked for his mother or not. We disagree with Lewis's characterization of Detective Lean's testimony. Detective Lean testified that, "[t]o the best of my recollection, I know if they asked to speak to their mother or father, or any other blood relative, it was like asking for an attorney and we were to stop our interview at that point. And I don't recall that ever being done." It was not unreasonable for the state court to rely on this testimony to determine that Lewis did not ask to speak with his mother.

Lewis also takes issue with the California Supreme Court's statements that Lewis "was keen enough to change his story when Detective Lean revealed that the fire originated from inside the car," that he was close to 14 years old, that he "remained in the same room for the ongoing interviews with the detectives and investigator," and that he "received various citations and warnings from the police before 1975." *Lewis*, 28 P.3d at 67, 69, 71. These facts are supported by the evidence in the record. Further, regarding Lewis's age, the California Supreme Court actually weighed Lewis's youth in his favor. *See id.* at 69 (reasoning that,

"[a]lthough defendant was less than 14 years old," other factors supported the conclusion that he made "a voluntary, knowing, and intelligent waiver").[7]

Lewis also argues that his trial counsel was ineffective for failing to argue during the penalty phase of the Simms trial that Lewis asserted his Fifth Amendment rights by requesting to speak to his mother during his interrogation for the Rogers murder. Lewis argues that his "request to speak to his mother was tantamount to a request for counsel and it should have terminated the interrogation." Lewis relies on *People v. Burton*, which held when "a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, must, in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege." 491 P.2d 793, 798 (Cal. 1971). The California Supreme Court deemed Lewis's *Burton* claim waived because Lewis raised it for the first time on direct appeal. *Lewis*, 28 P.3d at 70 (citing *People v. Raley*, 830 P.2d 712, 725 (Cal. 1992), *as modified on denial of reh'g* (Aug. 13, 1992)).[8]

---

[7] In his reply brief, Lewis also faults the California Supreme Court's failure to acknowledge what he considers to be the most important circumstance surrounding his confession, "the racial and racist overtones[] impact in this case." Lewis forfeited this argument by failing to raise it in his opening brief. *See Fauber v. Davis*, 43 F.4th 987, 1002 (9th Cir. 2022) (citing *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992)).

[8] The State argued in its brief to our court that *Burton* is inapposite because "by the time of Lewis's 1990 trial, the *Burton* rule was no longer good law." However, at oral argument, the State conceded that *Burton* is applicable here because it was good law at the time of Lewis's 1975

Lewis fails to show that his trial counsel was constitutionally ineffective in failing to make a *Burton* objection during the penalty phase. Even assuming that his counsel's performance fell below an objectively reasonable standard, Lewis fails to show how he was prejudiced. Lewis's testimony regarding whether he continued to speak with the detectives investigating the Rogers murder, after he asked to speak to his mother, was inconsistent. The trial court credited the testimony of Detective Lean, who testified that Lewis made no such request. Lewis cites no authority that permits us to second-guess this credibility determination within the confines of his federal habeas petition.

**2**

Lewis next argues that his trial counsel was ineffective at the penalty phase of the Simms trial by failing to introduce evidence that Lewis was innocent of the Rogers murder. Lewis originally raised this claim in his first state habeas petition, and the California Supreme Court summarily denied it on the merits. In support of this claim, Lewis argues that his trial counsel: (1) failed to adequately object when Sylvester Green, one of Lewis's companions on the day of the Rogers murder, invoked his Fifth Amendment right to silence during the penalty phase of the Simms trial; (2) failed to call witnesses who would have testified that Lewis had no reason to kill Rogers, Rogers was a heavy drinker who often smoked cigarettes and slept in his car, and Lewis and his companions ran *toward* the burning car rather than away from it; and (3) failed to "adequately investigate, develop and present available eyewitness and scientifically

---

interrogation. The State therefore argues that, assuming Lewis's trial counsel should have made a *Burton* objection, Lewis has not shown that he was prejudiced by that error.

reliable evidence that Roger's death was accidental, not homicidal." Lewis relies on declarations from two witnesses to the fire and an expert declaration challenging the State's arson experts.

None of Lewis's arguments establish that his trial counsel's performance fell below an objectively reasonable standard. Defense counsel unsuccessfully objected to Green's invocation of his Fifth Amendment privilege during the penalty phase. Lewis cites no authority showing that defense counsel had a basis to make any further challenge to Green's privilege claim.[9]

Lewis also argues that additional witness testimony could have shown that he was innocent of the Rogers murder, but the potential testimony he identifies would have been largely cumulative of evidence the jury heard during the Simms trial. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998), *as amended* (Aug. 27, 1998) (concluding that counsel's failure to present cumulative testimony was not deficient). The little testimony that was not cumulative would not have rebutted Lewis's admitted motive for igniting the fire that killed Rogers or the other expert and lay testimony about the circumstances of Rogers's death. Lewis's remaining evidence was not part of

---

[9] During the penalty phase of the Simms trial, defense counsel called Green to testify about what he witnessed the day Rogers was killed. On the advice of counsel, Green invoked his Fifth Amendment privilege in response to defense counsel's questions. Defense counsel eventually objected to Green's refusal to say whether he remembered speaking to the defense investigator. Based on the information Green told the defense investigator, defense counsel argued that nothing Green would testify to could be considered inculpatory. The trial court overruled the objection. After Green continued to invoke the Fifth Amendment, defense counsel passed the witness.

the state court record when the California Supreme Court denied Lewis's claim, and it cannot be considered in an AEDPA review of that decision. *See Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (holding that federal courts may not consider new evidence in reviewing a state court decision under 28 U.S.C. § 2254(d)). Because Lewis has not shown that his trial counsel's litigation of the Rogers murder evidence was deficient, we do not decide whether Lewis was prejudiced by his counsel's performance.

## B

We also affirm the district court's denial of Lewis's certified penalty-phase claims related to his trial counsel's presentation of mitigation evidence. Lewis contends that counsel was constitutionally ineffective by failing to investigate, develop, and present evidence of: Lewis's childhood abuse, neglect, and abandonment; positive aspects of Lewis's character and the role of substance abuse in his life; and Lewis's mental deficits.[10] Lewis raised these claims in his first state habeas petition, and the California Supreme Court summarily denied them on the merits. The district court ruled that the state court's decision did not run afoul of AEDPA because the court reasonably could have determined that: (1) counsel's performance was not deficient due to the generally cumulative and speculative nature of the unpresented mitigation evidence; and (2) any deficient performance was not prejudicial in light of the "substantial aggravating circumstances" and the weakness of the unpresented mitigation evidence.

---

[10] These arguments correspond to Claims 14, 15, and 16 of Lewis's first amended petition.

We agree with the district court that the state court could reasonably have determined that Lewis had not shown that defense counsel's presentation of mitigation evidence at the penalty phase of the Simms trial was deficient, and even if it were deficient, Lewis had not shown that it was prejudicial. Lewis's counsel made a reasonable strategic decision to focus on mercy and lingering doubt about Lewis's guilt rather than his upbringing, and the evidence he contends his trial counsel should have presented would have been either cumulative or insufficient in light of the State's aggravating evidence.

Lewis contends that his trial counsel was ineffective in presenting evidence of his troubled upbringing because, "[t]hough there were numerous lay witnesses available . . . , counsel contacted only three witnesses – and failed to adequately interview and prepare them to testify meaningfully in mitigation." Lewis also argues that his trial counsel was ineffective by not presenting evidence about Lewis's familial and personal history with substance abuse, including consulting mental health experts on the topic. Lewis points to a long family history of alcoholism, including his maternal grandmother and grandfather, his maternal uncle, and his mother. Lewis further argues that his trial counsel failed to present evidence that Lewis's childhood was marred by racial prejudice and child abuse. Lewis contends his trial counsel's failure to present this evidence cannot be ascribed to a tactical decision because "defense counsel did not investigate it so they knew nothing of it." Finally, Lewis contends that his trial counsel was ineffective in failing to provide his penalty-phase mental health experts with information about "Lewis's psycho-social, familial and substance abuse history." He contends that his trial counsel did not give his penalty-phase experts

information about his childhood exposure to lead and pesticides, the possibility that he suffered from fetal alcohol syndrome, or his injuries from colliding with a truck while riding his bicycle as a child. Lewis's post-conviction expert, Dr. Karen Froming, faults Lewis's penalty-phase experts for ignoring Lewis's abnormal electroencephalogram (EEG) results from 1975 and for failing to administer the Wechsler Adult Intelligence Scale III (WAIS III) test to determine Lewis's general intellectual level. Lewis also criticizes his trial counsel for having him meet with the two experts for the first time just days before the penalty phase began.

Lewis has not shown that his trial counsel was deficient in investigating and presenting mitigation evidence at the penalty phase. First, he fails to establish that his trial counsel did not investigate his background to discover mitigation evidence. About a year before trial, the defense investigator began contacting Lewis's "voluminous list of witnesses" for both phases of the trial, and counsel sought and obtained a continuance to allow for that investigation. The record shows that the jury was told about almost all of the material information Lewis faults his counsel for failing to investigate and present, including his mother's alcoholism and its effect on his development, his family's poverty, the lack of supervision during his childhood, his history of substance abuse, and his enrollment in college for a short period of time. And in addition to interviewing Lewis, the defense's two penalty-phase experts reviewed Lewis's medical records, conducted tests, and consulted with other experts. Lewis's EEG from 1990 was "essentially normal," and the WAIS III test, which Dr. Froming says Lewis's trial experts should have administered in 1990, was not published until 1997, *see Pruitt v. Neal*, 788 F.3d 248, 258 n.1 (7th Cir. 2015). Lewis has not shown that his trial counsel's

investigation and presentation of expert witness testimony fell below an objectively reasonable standard.

As for the evidence not presented to the jury, Lewis fails to show that this was not a result of a reasonable tactical decision by his trial counsel. *See Strickland*, 466 U.S. at 690 (explaining that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). While presenting some evidence of his childhood, Lewis's trial counsel chose to focus on testimony from Lewis's family asking the jury to spare his life, which "is a valid approach to mitigation." *Livaditis v. Davis*, 933 F.3d 1036, 1048 (9th Cir. 2019). Counsel also invoked lingering doubt, which "has been recognized as an extremely effective argument for defendants in capital cases." *Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2002), *as amended* (Sept. 9, 2004) (quoting *Lockhart v. McCree*, 476 U.S. 162, 181 (1986)) (internal quotation marks omitted). Given these tactical choices, the California Supreme Court reasonably could have concluded that Lewis's counsel was not deficient at the penalty phase.

Even assuming his trial counsel was deficient in presenting mitigation evidence at the penalty phase, Lewis fails to show how he was prejudiced by those decisions. Much of the unpresented evidence would have been cumulative of evidence the jury heard, and some of it would not have been wholly favorable to Lewis. For example, one witness declaration stated that Lewis was the favored child in his family. Another declaration stated that Lewis began stealing at an early age. Other unpresented evidence would have been weak or speculative. Lewis offers no evidence that he suffers mental health impairments due to fetal alcohol syndrome, exposure to pesticides and lead, or his bicycle

collision with a truck. Dr. Froming writes only that, based on Lewis's family medical history, these factors *possibly* affected Lewis's mental condition.

In addition, the California Supreme Court could have reasonably concluded that the balance of the mitigating and aggravating evidence failed to show prejudice. The unpresented evidence of Lewis's upbringing does not show the type of nightmarish childhood that has been grounds for habeas relief in other cases, *see Williams*, 529 U.S. at 395, and the aggravating evidence was strong, including the circumstances of the Simms murder, Lewis's involvement in the Rogers murder, and Lewis's convictions for home invasion and robbery of an elderly woman. In sum, even assuming Lewis's trial counsel was deficient in failing to present additional evidence at the penalty stage, the district court did not err by finding that the California Supreme Court reasonably could have concluded that Lewis was not prejudiced by his counsel's performance.

## C

Lewis also raises three uncertified claims on appeal. To obtain a COA on these claims, Lewis "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This standard requires "something more than the absence of frivolity or the existence of mere good faith on [the petitioner's] part." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (internal quotation marks and citation omitted). We ordered and

received supplemental briefing on these uncertified claims. *See* 9th Cir. R. 22-1(f).[11]

## 1

Lewis seeks a COA on Claims 2 and 10 of his first amended petition. Claim 2 argues that Pridgeon's testimony was unreliable, unintelligible, and internally inconsistent and was therefore insufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979), to support Lewis's convictions for first-degree murder and robbery. Claim 10 similarly argues that there was insufficient evidence to support the jury's finding that Lewis robbed Simms. On appeal, Lewis collapses Claims 2 and 10 together and argues that Pridgeon's testimony was insufficient to support a robbery conviction, felony murder based on robbery, and a robbery special circumstance.[12]

We deny a COA on Claims 2 and 10. For claims challenging the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

[11] The State argues that these claims are procedurally defaulted. We do not see grounds to grant COAs on these claims. Even if we did, a procedural default analysis is not required for claims that lack merit. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are . . . clearly not meritorious despite an asserted procedural bar." (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997))).

[12] The jury was instructed on both premeditation and felony-murder theories of first-degree murder. The jury issued a general verdict of first-degree murder that did not specify whether it was based on premeditation or on felony murder.

Whether Pridgeon's testimony was credible was within the exclusive province of the jury. *See Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013). Additionally, the jury reasonably could have relied on the evidence that corroborated Pridgeon's description of how Simms was murdered, including the blood evidence obtained from the shoes Lewis was wearing when he was arrested, the pathologist's testimony about the nature of Simms's injuries, the damage to Simms's blouse and the money found in her bra, and the fact that Pridgeon led police to the discarded murder weapon—a two-by-four that yielded blood evidence and matched a wood chip taken from Simms's hair. The jury also reasonably could have relied on the expert testimony that Pridgeon was capable of providing a generally accurate account of what he had witnessed on the night Simms was murdered even though he was cognitively impaired.

## 2

Lewis also seeks a COA on Claim 12, which alleges there was juror misconduct based on two jurors' reliance on "the doctrine of everlasting life" when they voted to impose the death penalty. The jury deliberated for four days at the end of the penalty phase. Post-trial, a member of the jury signed a declaration stating that, during penalty phase deliberations, the jury foreperson "asked why people were having a difficult time making a decision," and one juror replied that "she needed some time to make the right decision, knew what was right, but was having difficulty in voting." In response, the foreperson allegedly "said he did not know if it would help her, but what had helped him make his decision was that [Lewis] had been exposed to Jesus Christ and if that was in fact true [Lewis] would have 'everlasting life' regardless of what happened to him."

The trial court denied Lewis's motion to set aside the verdict based on these statements. *Lewis*, 28 P.3d at 71. It also denied Lewis's alternative request for a hearing to investigate juror misconduct. *Id.* On direct appeal, the California Supreme Court held that "[t]he trial court correctly determined that [Lewis's] proffered evidence was inadmissible" under California's no-impeachment rule because "[t]he exchange between [the two jurors] clearly involved their decisionmaking processes." *Id.* at 72 (citing Cal. Evid. Code § 1150(a)). The court further concluded that Lewis's proffered evidence did not fit under an exception to California's no-impeachment rule for a juror's consideration of, or reference to, an extraneous source. *Id.* The district court found that the California Supreme Court "was reasonable in finding [the foreperson's] statements did not impermissibly influence sentence selection" because his "statements reasonably could be seen as deliberative rather than improper extrinsic evidence." Lewis argues that the California Supreme Court's decision "was contrary to and an unreasonable application of *Mattox v. United States*, 146 U.S. 140 (1892) and *Remmer v. United States*, 347 U.S. 227 (1954)." "The *Mattox-Remmer* framework set forth by the Supreme Court governs juror misconduct claims involving consideration of extraneous evidence during deliberations . . . ." *Kipp v. Davis*, 971 F.3d 866, 881 (9th Cir. 2020).

We deny a COA on Claim 12 because we are not persuaded that reasonable jurists could find the district court's assessment of the California Supreme Court's decision "debatable or wrong." *Slack*, 529 U.S. at 484. The California Supreme Court reasoned that the foreperson's comments "did not improperly refer to an extraneous source" because they merely reflected his "knowledge and

beliefs" based on his "everyday life and experience," and jurors sharing their personal religious beliefs during penalty deliberations is not unexpected or improper. *Id.* at 72–73 (quoting *People v. Riel*, 998 P.2d 969, 1015 (Cal. 2000)). Lewis fails to show that this conclusion was unreasonable.

The *Mattox-Remmer* framework applies only if an extraneous source influenced the jury's deliberations. *See Fields v. Brown*, 503 F.3d 755, 779–80 (9th Cir. 2007) (en banc).[13]  Because Lewis fails to show that the California Supreme Court was unreasonable in concluding that the jury did not consider an extraneous source, we do not reach his *Mattox-Remmer* argument.

Construed broadly, Lewis's briefing also raises an argument that the foreperson's comments constituted religious discrimination in violation of Lewis's constitutional rights.  He cites no authority that supports this argument.  Lewis's attempt to invoke *Peña-Rodriguez v. Colorado* is misplaced because *Peña-Rodriguez* was decided 16 years after the California Supreme Court considered his juror-misconduct argument. *See* 580 U.S. 206, 225 (2017) (holding that the Sixth Amendment requires an exception to the no-impeachment rule "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant"); *see also Brown v. Davenport*, 596 U.S. 118, 136 (2022) ("[S]tate-court decisions are measured against

---

[13] Under the *Mattox-Remmer* framework, a court first asks whether the extraneous evidence "was 'possibly prejudicial.'" *Godoy v. Spearman*, 861 F.3d 956, 962 (9th Cir. 2017) (en banc) (quoting *Mattox*, 146 U.S. at 150).  If the court finds the possibility of prejudice, the extraneous evidence is "deemed presumptively prejudicial," and the burden shifts to the State to show that the jury's consideration of the extraneous evidence was harmless. *Id.* (quoting *Remmer*, 347 U.S. at 229).

[the Supreme] Court's precedents as of the time the state court renders its decision and cannot be held unreasonable only in light of later decided cases." (internal quotation marks and citation omitted)).

## IV

The California Supreme Court reasonably rejected Lewis's claims that the admission of his confession to the Rogers murder was unconstitutional and that his trial counsel was ineffective in presenting mitigation evidence at the penalty stage. Reviewing under AEDPA's deferential standard, we affirm the district court's denial of Lewis's first amended petition for writ of habeas corpus.

**AFFIRMED.**